450 P.2d 364

The STATE of Arizona, Appellee,

v.

Ernest A. MIRANDA, Appellant.

No. 1802.

Supreme Court of Arizona.

In Banc.

Feb. 6, 1969.

Rehearing Denied March 11, 1969.

Gary K. Nelson, Atty. Gen., Darrell F. Smith, former Atty. Gen., for appellee.

Lewis, Roca, Beauchamp & Linton, by John P. Frank, John J. Flynn and Paul G. Ulrich, Phoenix, for appellant.

. MOLLOY, Judge, Court of Appeals.

This is an appeal from a conviction of rape and kidnapping, resulting from a re-trial mandated by the decision of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In its second appearance before this Court,[1] there are ramifications of the same constitutional problems involved previously, with new assertions being posed as to the necessity of providing counsel to an indigent defendant at a preliminary hearing, as to the right of cross-examination of a witness despite a Fifth Amendment claim of privilege and as to the prejudicial effect of remarks of the prosecuting attorney at time of closing argument.

The trial below was mainly devoted to ruling upon the defendant's contention that the identification of him by the prosecuting witness, and a confession made to a woman with whom he was living at the time of the offense, were the "fruits" of the confession determined to be illegal by the Supreme Court of the United States.[2] The facts surrounding the identification of the defendant by the prosecutrix, and the communication of a confession to a Mrs. Twila Hoffman, are largely without dispute. The evidence, we now state, was taken in the absence of the jury, in connection with the defendant's contentions that he was arrested without cause, that he was not warned of his Fifth Amendment privileges, and that both the identification of him by the prosecutrix and the confession related to Mrs. Hoffman were the "fruits" of these violations of his constitutional rights.

In the early morning hours of March 3, 1963, the prosecutrix, an eighteen-year-old girl, reported to the police that she had been kidnapped and raped. She gave the police a description which generally applied to the defendant. She described the car in which she had been taken as an "old model, possibly 1955 Chevrolet or Ford, light green with good paint and clean on the outside, brown upholstery, very shabby inside."[3] She described two "ropes" on each side of the back of the front seat, attached in such manner as to give passengers in the rear seat a grab hold to raise themselves out of the back seat. There was testimony that this type of accouterment was unusual in model cars 1950 and later. The prosecutrix

---

1. State v. Miranda, 98 Ariz. 18, 401 P.2d 721 (1965), is the decision reversed, on certiorari, by the above-cited decision of the United States Supreme Court.

2. This was an eight-day-trial, by a sequestered jury. All of the testimony presented to the jury occurred during approximately one-half day; the bulk of the remaining trial was taken up by the court, in the absence of the jury, in passing upon Fifth Amendment evidentiary problems.

3. This is a quote from the initial police report.

also described a vertical stripe on the upholstery in the back seat.

Approximately one week after the assault upon her, the prosecutrix was again returning to her home after working late hours as a cashier in a theater. She was to be met at the bus stop by her brother-in-law, who was to walk home with her. While waiting for the prosecutrix, the brother-in-law saw an old model car "cruising" in the neighborhood in a manner that invoked his attention. When the prosecutrix arrived, they saw the car parked on a side street one block from where the car, into which the prosecutrix was forced the previous week, had been parked. The prosecutrix was of the opinion that the car looked like the car in which she had been raped. The driver of the car was outside of his vehicle at that time and the brother-in-law chased this unknown person to his vehicle but was unable to approach him for questioning before he drove off. The brother-in-law identified the make of the car as a 1953 Packard and this was confirmed by him when he was shown a 1953 Packard in a used car lot.[4] The brother-in-law derived a license number which he gave to the police as "DFL 312" (Arizona). A police check with the Motor Vehicle Division disclosed that there was no 1953 Packard licensed in this number, but that there was a car with license No. DFL 317, registered in the name of Mrs. Hoffman.

A check in the neighborhood of the Mesa, Arizona, address given in the vehicle registration disclosed that an Ernest Miranda and family had been living at that address and had recently moved. The neighbors gave a description of the Miranda that had lived at this address which was similar to the description given by the prosecutrix. The neighbors also informed the police of the name of the current employer of the defendant. From the employer, the police learned that the defendant was ordinarily employed nights, but had not been working on the night of March 2–3, when this incident occurred. A check with the Mesa police disclosed that the defendant had a police record, including a robbery, a Dyer Act conviction, a conviction for assault with intent to commit rape, and numerous arrests for drunkenness and fighting. From the employer, the police obtained the new address for the defendant and when they arrived at the new address, they saw the 1953 Packard parked beside the house. The investigating detective looked inside the car before going to the door of the house and ascertained that there were two ropes on the back of the rear seat, as described by the prosecutrix, that there was a vertical stripe on the back seat upholstery similar to that described by the prosecutrix.

The detectives were met at the door by Mrs. Hoffman, who called the defendant to the door to talk to them. These officers asked the defendant to come down to the police station to discuss a case they were investigating and which they would rather not discuss in front of his family. The defendant acceded to this request and went with the officers at about 11:30 a.m. This was on March 13, 1963.

The police interrogated the defendant upon his arrival at the police station for approximately thirty minutes, during which time he denied all connection with (1) this crime, (2) a rape attempt on another female, and (3) a purse snatching offense. Thereupon defendant was asked whether he would participate in a lineup, to which he agreed and selected position No. 1 in the lineup. The prosecutrix was brought to the station to observe the lineup. A previous lineup had been conducted on the morning of March 3, with the participation of the prosecutrix, with negative results. On this occasion, the prosecutrix stated that the No. 1 person in the lineup had the same type build and features as her assailant but that she could not "identify" the subject. She stated that, if she could hear the suspect's voice, she might be able to identify him through his voice.

4. Among the identifying features of the car was an oblong-shaped tail light running in a horizontal direction, with a piece of metal trim running vertically through the tail light from the tail fin.

With this information, the officers again interrogated the defendant and informed him that the prosecutrix had identified him. This interrogation was shorter than the first one and resulted in a full confession by the defendant of this offense. His verbal account of what had occurred coincided generally with the story previously given by the prosecutrix.

After this oral confession, the prosecutrix was brought into the room and in her presence, the defendant acknowledged that she was the girl he had assaulted. Immediately thereafter, the prosecutrix made a positive identification. At the hearing before the court, in the absence of the jury, she testified that she was able to positively identify the defendant without hearing him speak.[5] At approximately this same time, the defendant signed a written confession. At 1:30, in the afternoon, the defendant was formally arrested for kidnapping, rape and failure to register as an ex-convict.

Subsequent to this lineup, and either before or after his formal arrest, on this same afternoon, the defendant was put in another lineup, which resulted in an identification for the attempted rape of another female and a confession by the defendant as to this offense. Additionally, a confession was obtained in connection with a purse snatching charge. These other charges become collaterally pertinent here in considering the defendant's contention that, at the time of his confession to Mrs. Hoffman, he was illegally detained.

On March 14, the defendant was brought before a city magistrate on the failure to register charge, and after acknowledging his failure to register as a convicted felon, after his move to the City of Phoenix, the defendant was sentenced to ten days in jail for this offense. On March 15, the defendant was interrogated in the forenoon for one hour and five minutes by police officers in connection with various purse snatching incidents. To these accusations, the defendant stated that "he could not remember for sure." No further confessions were obtained in this regard, but police reports admitted in evidence, in this trial in the absence of the jury, indicate a "positive identification" of a purse snatching offense. At this same time, on the 15th, the defendant was interrogated as to a homicide charge, which was denied.

After this interrogation, the defendant was brought before a justice of the peace for an "arraignment"[6] on the kidnapping and rape charge and upon the robbery (purse snatching) complaint. At the time of his appearance before the justice of the peace, the defendant was informed, as required by Rule 16, R.Crim.P., 17 A.R.S., of the charge against him, of his right to the

---

5. Testimony in this regard is:

"Q Now, when you heard this [statement by the defendant that she was the girl], what made you able to identify him at that point?

"A Well, just his presence in the room, I could. I don't know—something just came over me, I can't explain it. I just knew that he was the one, whereas I couldn't when he was in the lineup.

\* \* \* \* \*

"Q After he said that [the defendant's statement that she was the girl], you said, 'I am positive that is the man.' Is that correct? Is that when you said, 'I am positive that is the man?'

"A I didn't have to hear him.

"Q Is that when you said you were positive that was the man?

"A Yes, sir."

6. The appearance before the justice of the peace is not actually an "arraignment." Under our Rules of Criminal Procedure, a defendant charged with an offense which the magistrate is not empowered to try (any offense carrying a maximum penalty in excess of six months incarceration) does not plead either guilty or not guilty to the charge before the magistrate. *See* Rules 16 through 25, Rules of Criminal Procedure, 17 A.R.S. The sole purpose of the proceeding before the magistrate, as to such an offense, is to determine whether there is probable cause to hold the defendant to answer to the criminal charge made. Rule 33, R.Crim.P., 17 A.R.S.

aid of counsel during the proceedings, but at his own expense, and of his right to waive a preliminary examination. At the time of his initial appearance before the justice of the peace, the defendant indicated that he wished a preliminary hearing on both charges, and a preliminary examination was set for March 27. On March 27, the defendant indicated to the magistrate that he was financially unable to employ counsel and for this reason would waive the preliminary examination. Upon this waiver, the defendant was bound over to the superior court to answer the felony charges against him.

After his initial appearance before the justice of the peace, the defendant was not further interrogated by the police. Total previous interrogation had not exceeded three hours duration. On March 16, he was visited by Mrs. Hoffman. The defendant testified, in the absence of the jury, that he informed her that he had confessed to the charges of kidnapping and rape. At his first trial, Mrs. Hoffman did not testify as to any confession, but, when interviewed by the police some two weeks before this trial, she informed them that the defendant had, on this occasion in the jail, fully confessed to her, and had related some of the intimate details of the offense.

During the course of the hearing before the court, the court ruled that, at the time the defendant was taken from his home by the police officers for interrogation on the morning of March 3, 1963, the defendant had not been "arrested" and that he was not actually "arrested" until after his confession. The court further indicated that, at the time the defendant was asked to go to the station for interrogation, there was no reasonable grounds for his arrest.[7] The court further ruled, as a result of the out-of-court testimony, that the prosecutrix' identification of the defendant, after the defendant had spoken in her presence acknowledging his guilt, could not be used in evidence against the defendant because it was the "fruit" of the illegal confession. The court further ruled, over a similar objection, that the testimony of Mrs. Hoffman, as to the defendant's confession to her, should be admitted.

During the trial before the jury, the prosecutrix testified on direct examination, without objection from the defendant, that she had "picked out" the defendant in the lineup as her assailant. Subsequently, in response to a question phrased by defendant's counsel, the prosecutrix testified that she did "identify" the defendant at the lineup as her assailant. The prosecutrix also indicated that she could "identify" that person in the courtroom, and pointed out the defendant, as her assailant. The prosecutrix also testified, in the jury's presence, to noticing the 1953 Packard, "similar" to the car used by her assailant, on the streets of her neighborhood on the occasion approximately a week after this crime. At the conclusion of the State's case, the court, on motion of the defendant, granted a motion to strike all of this testimony of the prosecutrix and, upon stipulation of counsel (without the waiver of defense counsel's motion for mistrial), the jury was instructed:

"At this time the Court is going to strike from the record all testimony of the Prosecutrix in this matter, [name of prosecutrix], to the effect that she picked out or pointed out the Defendant in the line-up at the City Police Department, and the Jurors are therefore instructed to disregard same in its entirety, in their deliberations.

"As a substitute therefore, the attorneys have stipulated that if [name of prosecutrix] were to be called back to the Witness Chair, she would testify at this time as follows:

"'Officers obtained three Mexican males from the City Jail to stand in a line-up with Ernest Miranda. Ernest

---

7. At the time of this ruling, the court had not yet heard testimony to the effect that the investigating officer had noticed the "grab hold" rope on the back of the seat, and the vertical stripe in the upholstery, in the car parked by the Miranda home.

180

Miranda was given his choice of numbers and he picked number one. Patricia viewed the line-up through the two-way mirror and said she could not identify the suspect. She added that the number one man had the same type build and features as the suspect, or as Ernest Miranda.' "

## WAS THE DEFENDANT ILLEGALLY DETAINED?

We first turn to the defendant's contention that he was illegally detained, that all that occurred in the way of an identification by the prosecutrix and his divulging his guilt to Mrs. Hoffman are the "fruits" of that illegal procedure and must be suppressed under the principles enunciated in Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963).

■■■ It is the Fourth Amendment that is controlling. This Amendment, in pertinent part, provides that:

"The right of the people to be secure in their persons * * * against unreasonable * * * seizures, shall not be violated * * *."

This Amendment "* * * protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L. Ed.2d 576 (1966). But, "* * * what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). In Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court called our attention to the fact that this Amendment is directed against *seizures,* not *arrests:*

"Our first task is to establish at what point in this encounter the Fourth Amendment becomes relevant. That is, we must decide whether and when Officer McFadden 'seized' Terry and whether and when he conducted a 'search.' There is some suggestion in the use of such terms as 'stop' and 'frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution. We emphatically reject this notion. It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."

88 S.Ct. 1877.

■■■ We believe that *Terry* also teaches that a "seizure" may be reasonable under circumstances which would not justify an arrest and that constitutional rights do not necessarily depend upon the technicality of when a formal arrest is made. The real issue in any Fourth Amendment problem, as delineated by the Supreme Court of the United States, is whether the conduct of the police in making a search or a seizure has been reasonable in the particular circumstances or whether the police activity falls within the category of "* * * rude invasions of privacy * * *"[8]

■■■ Even in retrospect, we see nothing unreasonable in the police methods used in the investigation of this crime. To require the police to file formal charges in all cases before asking a suspect if he would be willing to submit to interrogation on a crime under investigation, will do no service to our culture. Such a rule will only result in formal charges being brought against persons who could easily clear themselves of suspicion if reasonable interrogation is permitted, or in a general prohibition of the questioning of suspects and a failure to solve a much higher percentage of the crime that is being committed in this country today.

8. Quote is from Mapp v. Ohio, 367 U.S. 643, 660, 31 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961).

At the time the defendant was asked to go to the police station to answer questions that would have been improper to ask in front of his "wife," the police had grounds for strong suspicion as far as the defendant was concerned. In something less than an hour of interrogation, these strong suspicions had culminated in a full confession and a positive identification. At this time, a formal arrest was made. If this is unreasonable, and in violation of our Constitution, then the Constitution means something substantially different from that which is in the best interests of our society. At the time of his confession to Mrs. Hoffman, the defendant was also rightfully held on other charges. We hold that the defendant was not illegally "seized" at the critical times here and we see no grounds for reversal on this score insofar as the identification and confession are concerned.

## WAS THE PROSECUTRIX' IDENTIFICATION TAINTED?

█ We pass on to the contention that the identification by the prosecutrix was the "fruit" of Miranda's illegal confession. Whether evidence is so connected with evidence illegally obtained as to be "tainted," and hence to be suppressed from the jury's consideration, appears to be a matter of law, initially to be ruled upon by the trial court. The progenitor of the "fruits" doctrine is Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

*Nardone* was concerned with the problem as to whether information obtained through illicit wire tapping could be used in evidence. In the particular setting of that case, the Court held as a matter of law that the evidence could not be used. However, the Court used careful language to indicate that the rule of suppression did not include all evidence which would not have been obtained but for the evidence illicitly received:

"Sophisticated argument may prove a causal connection between information, obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint. A sensible way of dealing with such a situation—fair to the intendment of § 605 [of the Communications Act of 1934], but fair also to the purposes of the criminal law—ought to be within the reach of experienced trial judges. The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin."

60 S.Ct. 268.

That the "fruits" doctrine is not a for-the-loss-of-a-nail-a-kingdom-was-lost rule is indicated in Wong Sun v. United States, *supra*. It seems probable that Wong Sun would not have "voluntarily" (83 S.Ct. 419) returned to the office of the Narcotics Bureau (83 S.Ct. 411) to make his incriminating statement if he had not been previously made aware of the physical power of the law when he was arrested " * * * without probable cause or reasonable grounds." 83 S.Ct. 419. Yet, in *Wong Sun,* the Court found that the confession was sufficiently " * * * 'attenuated as to dissipate the taint.'" 371 U.S. 490, 83 S.Ct. 419.

█ It seems to this Court that there is a natural classification of "fruits" into at least three possible categories. The first would be the situation presented in *Wong Sun*—that of a subsequent confession of the accused himself. The second might be tangibles of evidentiary value. The third might be testimony of witnesses who have personal knowledge of the crime. In declining order, there would usually be a decreasing degree of causal connection

between the previous invasion of privacy and the existence of the incriminating evidence and its availability to the prosecution.

We first turn our attention to the "identification" testimony of the prosecutrix, which, if there are such categories of "attenuation," would fall in the most attenuated class, though admittedly the special circumstances here place it at the least "attenuated" end of the spectrum within such a classification.

It is the defendant's contention that it was error to permit the prosecutrix to testify that she identified the defendant and that this error was not cured by the instruction to disregard this testimony.

If the Supreme Court of the United States has carried this "fruits" doctrine into the area of suppressing testimony falling within this postulated third classification of the living witness, it has not been called to our attention. That this doctrine may be moving rapidly in this direction, however, is indicated by two decisions of the Court of Appeals of the District of Columbia. In Smith and Bowden v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1963), it was contended that the testimony of an eyewitness had been discovered through an illegal confession obtained in violation of *McNabb* and *Mallory*.[9] The Court referred to the contention as being "novel" (324 F.2d 881), and the contention was rejected. Among the words of rationale for this decision are these:

"Here no confessions or utterances of the appellants were used against them; tangible evidence obtained from appellants, such as the victim's watch, was suppressed along with the confessions. But a witness is not an inanimate object which like contraband narcotics, a pistol or stolen goods, 'speak for themselves.' The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name

of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence."

324 F.2d 881–882

However, when the case of Smith v. United States, 120 U.S.App.D.C. 160, 344 F.2d 545 (1965), came before this same Court a majority of a three-judge panel applied almost a strict "but for" rule in reversing a trial court's determination that the testimony of an eyewitness was not tainted by an illegal search. The Court distinguished *Smith and Bowden* on the basis that, in the previous case, the eyewitness had first resisted the giving of evidence against the defendants and then had subsequently changed his mind in this regard (344 F.2d 547). If this is a valid distinction, then our constitutional privileges hinge on small differences indeed.

This Court refuses to follow the "but for" rule of *Smith* and prefers the holding of *Smith and Bowden supra*, as we understand it. We hold that the testimony of the prosecutrix here was, as a matter of law, sufficiently "attenuated" from the confession that she should not be foreclosed from testifying at the trial before the fact finder. We believe, "as a matter of good sense," this prosecutrix should have been permitted to relate to the jury her testimony that she was able to identify the defendant as soon as she was in the same room with him. We hold that it was error for the trial judge to exclude the prosecutrix' identification from the jury's consideration. Inasmuch as the ruling of the court, together with the stipulation entered into by counsel subsequently, gave to the defendant more protection than the

9. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

law actually entitled him, we see no error in the failure of the court to grant a mistrial on the basis of the identification evidence that the jury actually heard. *See* State v. Arroyo, 99 Ariz. 68, 406 P.2d 734 (1965), and State v. Overton, 2 Ariz.App. 376, 409 P.2d 92 (1965).

### WAS THE DEFENDANT'S CONFESSION TO MRS. HOFFMAN TAINTED?

 As to the confession obtained by Mrs. Hoffman from the defendant, the trial judge, after listening to several days of testimony as to the circumstances giving rise to this statement, held it to be admissible. It is our view that, under the holding of *Nardone,* this was not an abuse of discretion on his part. In so concluding, we have considered defendant's argument that, had it not been for the illegally obtained confession, the defendant would probably not have confessed his guilt to this woman. But we believe it to be conclusively established here that Mrs. Hoffman was in no way acting for the police when she visited the defendant with whom she was living and to whom she referred as "husband", on this occasion. Under the defendant's own version, he had not been interrogated by the police for more than a total of approximately two hours and this had ceased the day before he talked to Mrs. Hoffman. In relating to her the sordid details of this offense, he must certainly have had some disjointed motive, perhaps locked in the deep recesses of his subconscious, aside from the fact that he had confessed to the police. His relationship with this woman was very personal to him and to her. Official conduct had nothing whatsoever to do with the formation of that relationship.

Certainly the nature of the illegality which gives rise to the "fruits" must be considered in determining whether the evidence obtained is "tainted." Here, the violation was a failure to warn of constitutional rights which did not exist until sometime subsequent to the conduct. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 1882 (1966). Certainly such a "taint" should be more easily "attenuated" than conduct more clearly proscribed by our Constitution. We hold that there was a sufficient "break in the stream of events" between the confession to the police and the confession to Mrs. Hoffman, to justify the court in admitting this testimony. *See* Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967); Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967); and Evalt v. United States, 359 F.2d 534 (9th Cir. 1966); *cf.* Killough v. United States, 119 U.S.App.D. C. 10, 336 F.2d 929 (1964), and People v. Spencer, 66 Cal.2d 158, 57 Cal.Rptr. 163, 424 P.2d 715 (1967).

### WAS THE DEFENDANT IMPROPERLY CROSS-EXAMINED?

 The defendant complains that, in the hearing before the court in the absence of the jury, he was required to answer the question of whether his confessions to the crimes here charged were truthful ones. He contends that the ruling upon the voluntariness question should be decided completely divorced from the question of whether or not the confession was truthful. Reliance is taken upon the following statement from the *Miranda* decision:

> "It is now axiomatic that the defendant's constitutional rights have been violated if his conviction is based, in whole or in part, on an involuntary confession, regardless of its truth or falsity."

384 U.S. 464, 86 S.Ct. 1622.

 We do not believe that the trial court violated this axiomatic principle. It is obvious from this transcript that the trial judge did not regard, as conclusive of the voluntariness question, the fact that the defendant admitted his confessions were true. It is difficult to see, in any event, how this could be regarded as reversible error. It is well established that the admission of incompetent evidence, in a case tried to the court, is harmless error.

State v. Garcia, 97 Ariz. 102, 397 P.2d 214 (1964).

■ Nor, we do not consider that the allowance of this cross-examination was erroneous. This jurisdiction is dedicated to a broad leeway in cross-examination. State v. Little, 87 Ariz. 295, 350 P.2d 756, 86 A.L.R.2d 1120 (1960). The task before the trial court required it, in part at least, to consider the defendant's mental processes. The elusive nature of the voluntariness issue has been commented upon by our highest Court:

> "The notion of 'voluntariness' is itself an amphibian. It purports at once to describe an internal psychic state and to characterize that state for legal purposes. Since the characterization is the very issue 'to review which this Court sits,' Watts v. State of Indiana, 338 U.S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 (opinion of Frankfurter, J.), the matter of description, too, is necessarily open here."

> Culombe v. Connecticut, 367 U.S. 568, 605, 81 S.Ct. 1860, 1880, 6 L.Ed.2d 1037 (1961).

■ It is difficult for this Court to imagine a mental process involving the voluntariness of a confession that would not be amalgamated to some extent with the accused's own concept of his guilt. We cannot see that it is error for the court, in the absence of the jury, and after the defendant has elected to take the stand, to permit cross-examination of the defendant regarding his belief as to his guilt or innocence at the time of a purported confession, for whatever value this may have to the court in determining whether the defendant voluntarily gave that confession.

## DOES FAILURE TO PROVIDE COUNSEL AT PRELIMINARY HEARING INVALIDATE THESE CONVICTIONS?

■ The defendant complains of the failure to provide him counsel at the time of preliminary hearing. This Court has held that a preliminary hearing, in our practice, is not, in the absence of special circumstances creating prejudice to the accused, a critical stage in the prosection so as to require the appointment of counsel for the defendant at the State's expense. State v. Burrell, 102 Ariz. 136, 426 P.2d 633 (1967). We see no such special circumstances here. Nothing that the defendant said at the time of his appearances before the magistrate was used against him at his trial. Nor, was there any testimony taken at a preliminary hearing which was offered against him. There is no suggestion that any testimony was lost to the defendant by the failure to have a preliminary hearing. The defendant argues only that he was prejudiced in being denied an opportunity to have a discovery hearing to ascertain the nature of the evidence against him and that, if a preliminary hearing had been conducted, and, if the justice of the peace had had the prescience to know that the United States Supreme Court would declare confessions of this type illegal, he would not have been held for trial.

■ We fail to see that the defendant was prejudiced in either regard. Our Court has made clear that the purpose of a preliminary hearing is not to afford the defendant an opportunity for discovery but is limited to the determination that there is probable cause to hold the defendant to answer. State ex rel. Corbin v. Superior Court, 100 Ariz. 236, 241, 413 P.2d 264, 268 (1966), and see State v. Kanistanaux, 68 Wash.2d 652, 414 P.2d 784 (1966). Any discovery that occurs at a preliminary hearing is purely incidental to that proceeding and is not a right of the defendant. State v. Chambers, 100 Ariz. 368, 414 P.2d 742 (1966); State v. Smith, 99 Ariz. 106, 407 P.2d 74 (1965). This particular defendant, who has been tried twice for these same offenses, can show less prejudice in this regard than is ordinarily the case because through the vehicle of his first trial he was afforded substantial opportunity for discovery.

 As to the contention that the defendant would never have been bound over if there had been a preliminary hearing held soon after his arrest, we believe this argument again misses constitutional and statutory bases. There is no guarantee in the Federal Constitution of pretrial determination of probable cause. *See* Hurtado v. People of State of California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884). As to our own constitutional guarantee, Ariz.Const. art. 2, § 30, A.R.S., we have held that the waiver by a defendant of a preliminary hearing is a binding acknowledgement of the existence of sufficient evidence to hold him to answer. State v. Schumacher, 97 Ariz. 354, 400 P.2d 584 (1965).

 Moreover, under our Rules of Criminal Procedure, the entering of a plea to the charge, in the trial court, is a waiver of the right to a preliminary hearing. Rule 79, R.Crim.P., 17 A.R.S.[10] At the time this defendant initially pleaded not guilty to the information, in the case at bar, he was represented by counsel provided at State's expense. Under similar circumstances, we have held that the right to a preliminary hearing is waived. State v. Graninger, 96 Ariz. 172, 393 P.2d 266 (1964).

## WAS PREJUDICIAL, IRRELEVANT EVIDENCE ADMITTED?

 The defense complains that it was error to deny a mistrial because the State failed to connect certain evidence to the offenses charged. These complaints are directed (1) at the testimony of the prosecutrix that a car "similar" to that used in this offense was seen by her in the neighborhood about a week after the assault upon her, (2) at the attempt by State's counsel to have the prosecutrix identify two pictures of Mrs. Hoffman's car (which the prosecu-

trix was unable to do), and (3) at the testimony of Mrs. Hoffman that she loaned her car to the defendant on the evening in question and that the two pictures shown to the prosecutrix were pictures of her 1953 Packard.

Testimony, given in the court hearing, in the absence of the jury, that the "similar" car seen by the prosecutrix and her brother-in-law was a 1953 Packard and the testimony of the back seat "ropes" for grab holds was never offered in the jury's presence. The evidence now singled out for attack was not objected to as it was presented and the two pictures were never offered or admitted in evidence. At the conclusion of the trial, a motion for mistrial and to strike all of this testimony was made, and, without waiver of the motion for mistrial, by stipulation of counsel, the following instruction was given:

> "The Court further instructs the Jury that the testimony of [the prosecutrix] regarding the appearance of a car in the vicinity of her home on March 9, 1963 and the circumstances of seeing such a vehicle, are stricken from the record and the Jury is admonished to disregard it.

> "The Court further instructs the Jury that all testimony of [the prosecutrix] and Twila Hoffman concerning Exhibits Six and Seven, the photographs of a car, are hereby stricken from the record and the Jury admonished to disregard it."

We hold that this instruction cured any error that was made in the admission of this testimony. We see no "bell" here that could not be "unrung" as in State v. Kellington, 93 Ariz. 396, 398, 381 P.2d 215, 217 (1963). This testimony, if "prejudicial" at all, is only so because it might connect the defendant with this crime. It is not of such nature as to have collateral prej-

---

10. "No information may be filed against any person for any offense which may be punished by death or imprisonment in the state prison until such person has or waives a preliminary examination. *The fact that a preliminary examination was* *neither had nor waived shall in no case invalidate any information in any court unless the defendant objects to such information because of such fact before pleading to the merits.*" (Emphasis added) Rule 79, R.Crim.P., 17 A.R.S.

udicial effects, such as testimony of the commission of independent crimes or other disreputable conduct. If the testimony had any possible effect upon the jury's deliberations, it was because of whatever evidentiary value it had. Again, the instruction of the court gave to the defendant every advantage that the law entitled him, and we see no grounds for reversal.

## WAS DEFENDANT DENIED HIS RIGHT OF CROSS-EXAMINATION?

 The defendant complains that he was not afforded full cross-examination of Mrs. Hoffman. After testifying that she was not the legal wife of the defendant, the witness subsequently claimed the Fifth Amendment when asked questions about her relationship with the defendant (*i. e.,* whether the witness lived with the defendant as his wife and whether she had had a child by him), and when asked about certain inconsistent statements and conduct (*i. e.,* whether she had made under oath statements to the Arizona State Welfare Department that she was the wife of the defendant and whether she had filed a joint income tax return with the defendant as his wife). When she was first on the stand, the court sustained all of the witness's claims of privilege.[11] However, subsequently, the trial court reversed its ruling, required Mrs. Hoffman to retake the stand and permitted full cross-examination of her except that an objection of the State as to relevancy was sustained regarding questions about whether she had sworn under oath in a claim before the Welfare Department that she was the defendant's wife and whether she had filed a joint income tax return with the defend-

ant and received a refund check in this capacity. We doubt that the defendant was prejudiced by this limited restriction on cross-examination,[12] but base our holding of no error on the propriety of the trial court's ruling.

This is not a case of offering a prior inconsistent statement to show the falsity of a portion of a witness's testimony. The defendant does not contend that such cross-examination should have been allowed in order to discredit Mrs. Hoffman's statement that she was not the defendant's legal wife. The defendant himself, during the hearing in the absence of the jury, testified that he had never been married to Mrs. Hoffman. Instead, the argument is made that the defendant should have been able to show to the jury that the witness had prevaricated on other occasions and that therefore she may have prevaricated to this jury. Under our law, it is not proper to thus impeach by previous instances of misconduct. State v. Reyes, 99 Ariz. 257, 408 P.2d 400, 14 A.L.R.3d 1262 (1965); State v. Johnson, 94 Ariz. 303, 383 P.2d 862 (1963); and *see* Udall, Arizona Law of Evidence §§ 66 and 68, at 99 and 107 (1960).

## WAS DEFENDANT PREJUDICED BY IMPROPER ARGUMENT OF STATE'S COUNSEL?

 The final contention of error is that the county attorney committed reversible error in making prejudicial remarks at time of closing arguments. The principal argument objected to was one which called the jury's attention to the fact that there was no evidence presented to it to show that the defendant had *not* committed the offense in question. A prompt

11. Court was recessed during the trial so that Mrs. Hoffman could be provided the advice of counsel from the Public Defender's office.

12. In his closing argument, the defense counsel commented about the claim of

privilege taken by the witness as to these questions, and argued that such a claim indicated that, if the witness had been required to answer, her answers would have shown that the witness had sworn falsely "for money."

objection was made by the defendant's counsel to this argument and sustained by the court. The court agreed with defense counsel's statement that this argument was "contrary to the whole concept of our justice" and instructed the jury to disregard the argument "in its entirety."

In his closing argument, defense counsel called the attention of the jury to the fact that many of the witnesses endorsed on the information had not been produced by the State to testify. The suggestion was made that their testimony would have been unfavorable to the State's case. In final argument, the county attorney pointed out that the defendant had the names of these witnesses and could have subpoenaed them. On objection, the trial court ruled the comments "improper" and instructed the jury to disregard the State's argument. At the conclusion of the trial, the court gave standard instructions, *inter alia,* that the defendant was not required to produce any evidence in his own behalf, that his failure to take the stand should not in any way prejudice him or create any presumption against him, that the defendant was not required to prove his innocence but was presumed to be innocent at all stages of the proceedings, that the burden was upon the State to produce evidence sufficient to satisfy each individual juror beyond a reasonable doubt of the guilt of the defendant and that, upon the State's failure to do so, it was the sworn duty of the jury to acquit the defendant.

It is our view that any attempted transgressions of the rule of Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), proscribing comment by the prosecution of the defendant's failure to take the stand, were aborted by the prompt rulings and admonitions given by the court during the trial and by the appropriate instructions given to the jury.

Judgment affirmed.

UDALL, C. J., LOCKWOOD, V. C. J., and McFARLAND and STRUCKMEYER, JJ.