**Waverly Leroy PAYNE, Appellant**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 16268.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 12, 1961.

Decided July 13, 1961.

Certiorari Denied Oct. 16, 1961.

See 82 S.Ct. 131.

Mr. S. White Rhyne, Jr., Washington, D. C. (appointed by the District Court), for appellant.

Mr. Frank Q. Nebeker, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Nathan J. Paulson, Asst. U. S. Atty., were on the brief, for appellee. Mr. Oliver Gasch, U. S. Atty., at the time the record was filed, Mr. Carl W. Belcher, Asst. U. S. Atty., at the time the record was filed, and Messrs. Charles T. Duncan and Daniel J. McTague, Asst. U. S. Attys., also entered appearances for appellee.

Before WASHINGTON, DANAHER and BASTIAN, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a grand larceny case, in which the central question is whether the rule in Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, requires reversal of the conviction.

## I.

The facts, briefly, are these: Appellant was apprehended on November 4, 1960, shortly before noon. The arresting officer later testified that he had been told by a person (described only as a "citizen") that someone had tried to "flimflam" him. This was described as "where they use the old handkerchief trick and show you a roll of money and letter." The complainant pointed to a car emerging from a parking lot at a high rate of speed, and said "There's the man there," indicating Payne, the driver. The car—a Cadillac with a Florida license—was followed by the police in their scout car; when it stopped because of a construction barricade the police asked the three men in it to get out. When they did so, the police saw a large roll of money on the floor of the car. It "looked real" at the time, but later proved to be mainly fake money. The three men, one of whom was Payne, were taken to No. 4 Precinct and searched. Payne was found to be carrying six letters, each reading

"Dear Brother:

"I am sending you $10,000 with this letter. Don't tell anyone about it, not even mother. This money is tax free."

Each letter was purportedly signed by a prominent person. Payne also had in his pockets a roll of "play money," wrapped in a genuine dollar bill, and a handkerchief wrapped around some "balled-up newspaper." He was booked for "investigation." Some two hours later he was sent to Police Headquarters to be interviewed by Officer Dixon, in charge of confidence-game violations. That officer questioned him about several unsolved cases of this sort. Payne denied ever having been in the District of Columbia before. After about half an hour the officer put him in the cell block, and did not question him further at that time.

One of the unsolved confidence cases involved Jonathan Warren, who had been the victim of a handkerchief swindle perpetrated by two men on April 15, 1960—some six months earlier. The description of one of the swindlers given by Warren, as shown by Officer Dixon's file, seemed to fit Payne. The officer located Warren and asked him to come in. At about 7 p. m., a line-up was held at Police Headquarters, and Warren picked out Payne as one of the swindlers. Payne denied having taken part in the Warren swindle, as he had in his first talk with Dixon. However, when Warren, Payne and Dixon had returned to the latter's office, and Warren had recounted in detail how he was defrauded, Officer Dixon later testified that Payne began to laugh, and admitted his part in the offense. By this time it was 7:30 or 8 o'clock in the evening. Later, Payne was booked for grand larceny. On the following morning, at 10 or 11 o'clock, Payne was brought before a committing magistrate. He was later indicted for the April 15 offense. No action was taken concerning the episode of November 4, 1960.

Ulysses Morgan was also indicted for the April offense, and he and Payne were tried together. Payne's admission of guilt was excluded from evidence by the trial court. Warren, however, was permitted to identify Payne in the courtroom, without referring to his previous identification at the line-up. Warren testified that on April 15, as he was walking out of a bank, a man—whom he identified as Payne—approached him and asked directions to a certain hotel. Warren said no such hotel existed. After some conversation, Morgan walked up. Payne and Warren asked him about the hotel. He, too, disclaimed knowledge of it. After further conversation, Morgan offered to take Payne to see "some ladies." Warren started to leave, but Payne insisted that he accompany them. While walking, Payne displayed a large roll of what appeared to be money. Warren suggested that he put it in a bank for safety. Payne then asked Warren to keep the money for him temporarily. Warren agreed. Payne then wrapped the roll of money in a handkerchief and

gave it to Warren, who put it in his pocket. Payne then said that Warren's money should also be wrapped in a handkerchief. Warren produced $170 in bills, which Payne wrapped in a handkerchief. Payne told him to put it inside his shirt, apparently assisting in the process. Later, after the group had separated, Warren discovered that the handkerchief in his shirt contained nothing but balled-up paper.

Both Payne and Morgan were convicted and sentenced. Separate appeals were taken by each of them. See Morgan v. United States, 1961, 111 U.S.App.D.C. ——, 294 F.2d 911.

## II.

■ Appellant's main contentions, advanced by able court-appointed counsel, are that he was illegally arrested and illegally detained, and that no evidence produced by the illegal arrest or the illegal detention was admissible against him, under the rule announced in Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 and related cases.

As to the arrest: We think the circumstances justified the police officers in their pursuit of Payne and his companions, and in their arrest of Payne, who had been identified as the principal culprit in the attempted "flimflam" on November 4. The arrest of the others is not in question in this case. The citizen who complained to the officers was—according to his story—the victim of an attempted confidence game: there was either a conspiracy to commit robbery, if Payne and his companions were planning to take the victim's money by a stealthy snatching, or a conspiracy to commit grand larceny if they were planning to take his money by trick. In either event, the officers had probable cause to believe that a felony had been committed, and that the culprits were trying to escape in a speeding car. Arrest without a warrant was therefore

proper. Whether the officers went through this legal reasoning before beginning their pursuit is of course immaterial. Bell v. United States, 1958, 102 U.S.App.D.C. 383, 254 F.2d 82.[1]

■ The arrest justified the search which followed, and the seizure by the police from Payne of the letters, the rolls of fake money, and the handkerchief containing balled-up newspaper. This evidence would certainly have been admissible against Payne if he had been tried for an offense arising out of the events of November 4. But he was not tried for that offense. He was tried for the swindling of Warren, which occurred six months earlier. Appellant urges that the seized articles were not admissible against him in his trial for cheating Warren. The sole issue at the trial, he says, was the identity of the men who had cheated Warren—the fact of the larceny not being contested. His brief says that "the articles were relevant to the issue of identification, but they were relevant only on the ground of appellant's propensity to commit the type of crime charged." He argues that evidence of propensity to crime, or evidence of the general bad character of the accused, is barred unless he himself puts his character in issue. He cites in support of this proposition a number of authorities, including 1 Wigmore, Evidence § 57 (3d ed. 1940). But we think the evidence here in question went much beyond general bad character or propensity to crime. It showed Payne's possession of the tools of a confidence man, equipped to commit the very sort of crime of which Warren had been the victim. It tended to show, in Wigmore's words, a "design or plan" to commit crimes of this sort. 2 Wigmore, Evidence §§ 237, 300, 304, 305, (3d ed. 1940). In his concurring opinion in Martin v. United States, 1942, 75 U.S.App.D.C. 399, at page 401, 127 F.2d 865, at page 867, Chief Judge Stephens discussed this type of evidence at length,

---

1. United States v. Di Re, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210, on which appellant relies, is inapplicable here.

There the police had no previous information about Di Re; here they had a fresh complaint against Payne.

and quoted from the opinion of the Ohio Supreme Court in Whiteman v. State, 1928, 119 Ohio St. 285, 164 N.E. 51, 63 A.L.R. 595, to the following effect:

"'* * * in certain classes of cases collateral offenses may be shown as reflecting upon the mental processes or mental attitude of the accused, where intent or guilty knowledge is an essential element of the crime for which the defendant is on trial, or as throwing light upon the motive inducing the commission of the crime, or *to prove identity of the defendant, where identity is in issue,* and more especially where such collateral offenses have been executed according to a plan or method, and it is shown that the accused persons committed such other offenses, and in so doing followed the same plan or method as is shown to have been followed in the commission of the crime charged in the indictment.'" (Emphasis supplied.)

In the Whiteman case the evidence showed that the defendants had committed a series of robberies by impersonating uniformed police officers. They would drive their car next to that of a victim, force him to stop, and then rob him. Though the indictment before the court charged only one such offense, the evidence of the other similarly conducted robberies was held admissible as showing a design or plan, relevant to the issue of identity.

If, as Martin and Whiteman indicate, evidence of related offenses is admissible on a proper showing of design or plan, the evidence in the case at bar is *a fortiori* admissible. The showing made here was not of the actual commission of another crime, but of being equipped to commit an elaborate fraud of the kind which had been perpetrated on Warren. We hold that the evidence was properly admitted.

### III.

■ We turn to appellant's claim that his detention was illegal. As we have noted, Payne was arrested without a warrant at midday on November 4, and was detained during the afternoon and night. He was not taken before a committing magistrate until the morning of the following day. Rule 5(a) of the Federal Rules of Criminal Procedure 18 U.S. C.A. specifically requires that where a person is arrested without a warrant he shall be taken without unnecessary delay before the nearest available committing officer, and "a complaint shall be filed forthwith."

In this case appellant's lengthy detention produced two things—Warren's identification of Payne, and Payne's admission of guilt. The latter, the admission, was excluded from evidence by the trial judge under the rule in Mallory— rightly, we think, though the point is not before us for decision. It appears to have been the product of interrogation, rather than a spontaneous and voluntary admission. Cf. Fredericksen v. United States, 1959, 105 U.S.App.D.C. 262, 266 F.2d 463. As to the identification, the trial judge allowed Warren to identify Payne as he sat in the courtroom, but did not permit any reference to the identification made at police headquarters. Whether this last restriction was necessary under Mallory we need not say. However, it narrows the issue before us.

Appellant says that but for his detention he "would have blended back into the mass of the population", and would have remained at large. He cites our ruling in Bynum v. United States, 1958, 104 U.S.App.D.C. 368, 262 F.2d 465, where we held that fingerprints of the accused taken during a period of illegal detention should be excluded from evidence, and indicated that anything of "evidentiary value" produced by such detention should be proscribed. 104 U.S.App.D.C. at page 370, 262 F.2d at page 467. But we later affirmed Bynum's conviction after a second trial, at which the prosecutor introduced a fingerprint other than that taken during the period of illegal detention, but which he was able to obtain because he knew Bynum's identity as a result of the fingerprints taken during that period. See 1960, 107 U.S.App.D.C. 109, 274 F.2d 767. Implicit in our second holding was

a rejection of the sort of "fruit of the poisonous tree" argument advanced in the instant case. Cf. Nardone v. United States, 1939, 308 U.S. 388, at page 341, 60 S.Ct. 266, at page 267, 84 L.Ed. 307. The consequence of accepting appellant's contention in the present situation would be that Warren would be forever precluded from testifying against Payne in court, merely because he had complied with the request of the police that he come to police headquarters and had there identified Payne as the robber. Such a result is unthinkable. The suppression of the testimony of the complaining witness is not the right way to control the conduct of the police, or to advance the administration of justice. The rights of the accused in a case like the present are adequately protected when the complaining witness takes the stand in open court, for examination and cross-examination. Cf. Frisbie v. Collins, 1952, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541.

In the second place, confrontation may be beneficial to the accused rather than damaging to him: Warren might have declared that Payne was not the man who robbed him. Confrontation is thus a precaution against the making of baseless and unfounded charges. It holds few of the dangers which led to the promulgation of Rule 5(a), or the dangers attendant upon enforced fingerprinting during illegal detention. While we do not condone lengthy detention for the purpose of rounding up complaining witnesses so that they may view a suspect, we must note that here Payne's arrest was based on probable cause, and was proper. The police should have obeyed Rule 5(a): they should have brought Payne before a magistrate for commitment, and filed a complaint based on the events of November 4. But it does not follow that failure to do so vitiates Payne's conviction, since no evidence obtained by interrogation of Payne was introduced at his trial.

The judgment of the District Court will be

Affirmed.