Francis T. PROCTOR, Appellant,

v.

UNITED STATES of America, Appellee.

No. 18187.

United States Court of Appeals District of Columbia Circuit.

Argued March 20, 1964.

Decided June 25, 1964.

Petition for Rehearing en Banc Denied Oct. 7, 1964.

---

534

Edgerton, Senior Circuit Judge, dissented.

Mr. A. Alvis Layne, Washington, D. C., (appointed by this court), for appellant.

Mr. David Epstein, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker and Harold H. Titus, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON and PRETTYMAN, Senior Circuit Judges, and DANAHER, Circuit Judge.

DANAHER, Circuit Judge.

This appellant has attacked his conviction of housebreaking, robbery and assault with a dangerous weapon. It is contended that the trial judge erroneously denied the appellant's motion to suppress his confession. The highlights developed at the hearing on that motion may be summarized as follows.

Miss Helen Dadian, a part owner of the Embassy Hotel on Sixteenth Street was in the kitchen about 12:30 P.M. on May 17, 1963 when the appellant entered. She recognized him as Tony Washington, previously employed at the hotel. She asked "What are you doing here?" Panic-stricken by such unexpected confrontation, as he later said, the appellant tried to choke her and finally beat her with a hammer. The appellant disappeared briefly. Presently the appellant reappeared, demanded money, and again with the hammer struck her several times.[1]

Miss Dadian noticed that the telephone wires had been cut and called from a window for help. Detective Boyd responded and recovered pieces of wire which had been used in the strangling, the hammer with which the victim had been battered and a cardboard box from which money had been stolen. Based upon her having named "Tony Washington" as her assailant, the detective went to the appellant's mother who told him that her son went under the name of Francis Theodore Proctor and supplied a photograph of him. The following day the officer obtained an arrest warrant for Francis Theodore Proctor, also known as Tony Washington. His search for the appellant was fruitless throughout the next week. He requested Officer Bader of the Tenth Precinct to look for the appellant and turned over to him a photograph of the wanted man.

On the evening of May 25, 1963, Officer Bader encountered the appellant at a grille. The appellant testified that the officer asked him his name and that he responded his name was "Donald—called me James Brown, and some call me Tony." The officer showed him the picture, but the appellant said it was not a picture of himself. The officer asked the appellant if he would help "get it straightened out. I told him yes." Officer Bader then telephoned for Officer Boyd who was in charge of the case. The latter received the call over the radio, and in a cruiser drove to meet Officer Bader and the appellant.

1. Her wounds having required some fifteen stitches, the victim ultimately spent 22 days in the hospital.

Detective Boyd testified he told the appellant that he had a warrant charging assault with a dangerous weapon "for a Francis T. Proctor, alias Tony Washington, also called Sonny, and that if he were the man that he was going to be arrested under that warrant and charged; and he stated that his name wasn't Francis Proctor and that his name wasn't Tony Washington, that, however, he was called Tony by some of his friends and that in order to avoid being charged, since he wasn't the right man, that he would be willing to get it straightened out right then." The officer then asked if the appellant would be willing to go with him to the Sixteenth Street residence of a sister of Miss Dadian to see if she could identify him. He said "Yes, he would be quite willing because he didn't want to be charged under that warrant." In furtherance of his plan to escape identification, the appellant showed the officer documents bearing the name of Don Ameche Miller, including a North Carolina driver's license, a D. C. unemployment card and a draft registration card.

Confrontation at the home of the victim's sister was inconclusive; she was unable to identify him other than to say he looked like the man.

"The Court: Then, up to that time it was just a question of their asking you if you would come with them while they straightened the matter out; is that right?

"The Witness: Yes, sir.

\*　　\*　　\*　　\*　　\*

"Q. They were trying to establish your identity, weren't they, who you were?

"A. That's right."

The officer told the appellant: "Well, the only way that we can positively identify you would be to take you to the Dunbar Hotel where your mother and father live," and he said "Well, I don't have a mother and father, they are both dead," but he said, "If that's the end of it, let's go over there and finish it off so that I won't be charged."

When the officer knocked on the door and was admitted to the appellant's mother's rooms, she said "Sonny, what have you done?" The officer said "Is this your son?" and she said "Yes, it is." The appellant said to her "Woman, I never seen you before in my life." The appellant's stepfather also identified Proctor. Thereupon, the officer informed the appellant that there was no longer any doubt in his mind that he was the right man and that he was being placed under arrest. The officer told the appellant that anything he said would be used against him.

The appellant was then taken to the precinct and turned over to the officer whose duty it is to book and search prisoners. The appellant's wallet was produced. There were the North Carolina driver's license in the name of Don Ameche Miller, the draft card and the unemployment card which the appellant had previously shown to the officer. Also, however, in another compartment of the wallet was a Social Security card bearing the name of Francis Theodore Proctor. The officer showed that card to the appellant who then said "Yes, I'm the guy that you're looking for, I'm the fellow that hit that woman up on Sixteenth Street."

The detective read to the appellant a paragraph [2] on a statement form advising him of his rights and "that was the third time he had been advised." The appellant then related the incidents of the day of the crime which were written down by Detective Warner as another officer was preparing a statement of facts for the court and a line-up sheet for the

---

2. The paragraph reads as follows:
"Before making a statement you are advised of your constitutional rights, that you do no have to make a statement, that any such statement may be used against you in the event of a trial, that any statement made by you is made of your own free will without any threats or promises being made to you; after being so informed do you wish to make a statement? Answer: Yes."

Detective Bureau. The two detectives sat at adjoining desks, so that "the processing of the defendant was still going on while the statement was being also taken from him in the same room." Realizing that his ruse had failed, the appellant had spontaneously confessed.[3]

The trial judge denied the motion to suppress the confession.[4]

We are satisfied that there was no error.

Affirmed.

EDGERTON, Senior Circuit Judge (dissenting).

When Proctor was booked and searched in the police station at 10:55 p. m. on Saturday, the police discovered a card with his real name on it and he spontaneously confessed. He said in substance "I'm the guy that you're looking for who hit that woman up on 16th Street." This confession was not written down.

Instead of being taken to a magistrate immediately after he had been booked and had confessed, Proctor was taken upstairs to the "Detective's room", where for 50 minutes one officer filled out various forms and another officer obtained and typed a second confession.[1] This written confession was introduced in evidence.[2] Proctor was fingerprinted, photographed, and locked up until the following morning, Sunday, when he was placed in a line-up. He was not presented to the Commissioner until Monday morning.

After an arrest the "next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of

---

3. The exact time involved did not appear at the hearing on the motion to suppress, but at the trial Detective Boyd explained that the whole procedure might have taken "10 or 15 minutes."

   Writing for a unanimous court in Jackson v. United States, 114 U.S.App.D.C. 181, 184, 313 F.2d 572, 575 (1962), Judge Edgerton pointed out:

   "The critical period is that between arrest and confession. 'Detention *after* a confession plainly does not affect its admissibility. United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L. Ed. 1140.' Metoyer v. United States, 102 U.S.App.D.C. 62, 65 n. 4, 250 F.2d 30, 33 n. 4 (1957)."

4. Jackson v. United States, *supra* note 3; cf. Payne v. United States, 111 U.S. App.D.C. 94, 98, 294 F.2d 723, 727, cert. denied, 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961); Tillotson v. United States, 97 U.S.App.D.C. 402, 405, 231 F.2d 736, 739, cert. denied, 351 U.S. 989, 76 S.Ct. 1055, 100 L.Ed. 1502 (1956); United States v. Vita, 294 F.2d 524, 532 (2d Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962). And see Bailey v. United States, 117 U.S.App.D.C. ——, 328 F.2d 542 (1964).

1. When Boyd said "the whole procedure might have taken ten or fifteen minutes", I think he was not referring, as the court suggests, to "the processing of the defendant * * * while the statement was also being taken from him", but to the time between his oral confession at "booking" and the *beginning* of the confession that was later obtained and reduced to writing. His words "ten or fifteen minutes" were used in the following context. "Q How long after the incident that you just described which took place at the booking desk was this statement taken down in typewritten form? A Well, as soon as we got up to the Detective Office and got out to [sic] these forms and carbon paper and sat down at the typewriter and began the procedure which might have been ten or fifteen minutes."

   Boyd testified that Proctor was booked at 10:55 p. m. and then taken to the detectives' room. Boyd was asked: "Now, approximately how long did you stay in this room?" He answered: "Approximately fifty, fifty-five minutes." He said "the statement was completed, I believe, at * * * 11:50." It is undisputed that Proctor had confessed orally at about 10:55 while he was being booked. The written statement was completed and time-stamped at 11:50.

2. It does not purport to be a record of the earlier oral confession. It begins: "You are requested to make a statement relative to the robbery and assault that occurred at about 12:30 A.M. Friday, May 17, 1963 * * *"

course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt." Mallory v. United States, 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479 (1957). A "confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate." Upshaw v. United States, 335 U.S. 410, 413, 69 S.Ct. 170, 172, 93 L.Ed. 100 (1948). In my opinion Proctor's written confession was made during unnecessary delay and should have been excluded. Cf. Spriggs v. United States, 118 U.S.App.D.C. ——, 335 F.2d 283, 1964.

Wright, Circuit Judge, dissented.