Keith CREWS, Appellant,

v.

UNITED STATES, Appellee.

No. 8507.

District of Columbia Court of Appeals.

Argued July 16, 1975.

Decided Feb. 16, 1977.

W. Gary Kohlman, Public Defender Service, Washington, D. C., for appellant. Frederick H. Weisberg, Public Defender Service, Washington, D. C., also entered an appearance on behalf of appellant.

John W. Polk, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Stuart M. Gerson, and Harry R. Benner, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before FICKLING, NEBEKER and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant challenges his conviction of armed robbery (D.C.Code 1973, §§ 22–2901 and –3202) on the grounds that his in-court identification was the "fruit" of an illegal arrest, which hence should have been excluded as evidence. We affirm.

I

On the morning of January 3, 1974, a woman was robbed at gunpoint in the ladies' restroom on the grounds of the Washington Monument. Her assailant, peering through the crack between the door and the side of the stall that she occupied, requested admission and demanded $10. She refused, whereupon he pointed a

pistol at her and repeated his demands. She gave him $10, but he insisted that she open the stall door. When she did so, the gunman made sexual advances, including touching her breasts and asking her to perform fellatio. She resisted and pleaded with him to leave, which he finally did.

A similar incident occurred on the afternoon of January 6. In the same restroom, two other women were forced to surrender $20 to a youth who was wielding a broken bottle. All three victims described their assailant to the police as a 15-to-18-year-old Negro male of slender build and light complexion.

Three days later, Officers Rayfield and Barg of the United States Park Police observed appellant in the vicinity of the Monument. They stopped him and asked his name and age. He gave his name and his age, which was 16.[1] The officers asked why he was not in school, and said that he bore a likeness to the descriptions given by the robbery victims. Appellant replied that he had just "walked away from school", and the officers allowed him to go on his way. They then asked James Dickens, a tour guide who believed that he had seen the assailant of the first victim on January 3, if appellant looked familiar. Dickens responded that he thought appellant had been in the area that day. The Park Police officers stopped appellant a second time and summoned Detective Ore, the Metropolitan Police officer in charge of the robbery investigation. The detective arrived a few minutes later and attempted to take a picture of appellant to show to the robbery victims. When it was realized that inclement weather precluded acceptable photography, Detective Ore took appellant into custody as a suspected truant and transported him to Park Police Headquarters. He was detained there for approximately one hour, during which time the detective telephoned appellant's school, and the youth was photographed and interviewed.[2] Appellant then was released.

On the following day, the first victim was shown an array of eight photographs, including that of appellant. Although previously she had selected no suspect after viewing several hundred mugshots, she immediately identified appellant as her assailant. One of the other two victims made a similar identification of appellant from the photographs. Later, the first victim again identified appellant at a lineup.

Appellant filed a pretrial motion to suppress all identification testimony, contending that his detention for truancy had been a pretext to seek evidence for the robbery investigation, and that being the product of his illegal detention, the identification testimony was inadmissible. Following extensive testimony by appellant, the three victims, and Officer Rayfield and Detective Ore, the trial court found that the second detention constituted an arrest, and that as such it was defective for lack of probable cause. The court ruled that the photographic and lineup identifications would be excluded. However, on the grounds that the victims' ability to identify the robber (based on their face-to-face encounters with their assailant) was unaffected by the police conduct, it concluded that in-court identifications should be permitted. The jury convicted appellant of the armed robbery of the first victim, but

---

1. Appellant was prosecuted as an adult pursuant to D.C.Code 1973, § 16–2301(3)(A). He was sentenced to four years' probation under the Youth Corrections Act. 18 U.S.C. § 5010(a) (1970).

2. D.C.Code 1973, § 31–201 requires school attendance by all children between the ages of seven and 16. The officers testified that they had not placed appellant under arrest but had merely followed standard procedures for truancy cases. There was conflict between the testimony of appellant and that of the officers as to whether at the time he was stopped appellant offered any identification to substantiate his claim that he was sixteen and thus, by definition, not a truant. *Cf. Bates v. United States*, D.C.App., 327 A.2d 542, 543 & n. 2 (1974) (on appeal from a conviction, the evidence is to be viewed in the light most favorable to the government).

found him not guilty of all other charges.[3] Appellant now contends that the trial court erred in permitting the in-court identifications.

## II

Appellant's challenge to the identification testimony by the three women rests upon the "fruit of the poisonous tree" doctrine developed in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and their progeny. He contends that the in-court identifications were the result or "fruit" of an illegal arrest and detention, and therefore were inadmissible. We reject both his premise and his conclusion.

In *Wong Sun,* the Supreme Court held that in certain circumstances, evidence which the government has acquired either directly or indirectly as a result of a violation of an accused's Fourth Amendment rights may not be used to secure his conviction. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Silverthorne Lumber Co. v. United States, supra; Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). While the principle applies to testimonial as well as to tangible evidence [*Wong Sun v. United States, supra,* 371 U.S. at 485–86, 83 S.Ct. 407; *see also Bond v. United States,* D.C.App., 310 A.2d 221, 224–25 (1973)], the *Wong Sun* Court emphasized that the reach of the exclusionary rule is not unlimited (371 U.S. at 487–88, 83 S.Ct. at 417):

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting the establish-

ment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).

*Cf. United States v. Wade,* 388 U.S. 218, 240–41, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *see also Nardone v. United States,* 308 U.S. 338, 340–41, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Accepting the trial court's finding that appellant's detention constituted an arrest for which the police lacked probable cause, the question for our determination is whether the in-court identification testimony by the robbery victims properly may be characterized as evidence which resulted from an impermissible "exploitation" of that arrest. We conclude that it may not.

■ The challenged identifications rested upon the concurrence of (1) the ability of the witnesses to render such evidence (*i. e.,* the knowledge upon which their testimony was based), and (2) the opportunity for the presentation of the incriminating testimony (*i. e.,* the presence of both the witnesses and the accused in the trial). A witness' testimony may be held inadmissible when it rests upon knowledge or recollections of the underlying transaction which have been provided or significantly supplemented by improper police activity. *Cf. United States v. Wade, supra,* 388 U.S. at 239–40, 87 S.Ct. 1926; *People v. Stoner,* 65 Cal.2d 595, 55 Cal. Rptr. 897, 901, 422 P.2d 585, 589 (1967). Here, however, there was no such fatal infection. *Cf. Pender v. United States,* D. C.App., 310 A.2d 252 (1973). The trial court ruled that the identification testimony rested upon the independent basis of the victims' face-to-face encounters with their assailant, and we find its conclusion amply

---

3. In addition to the charge of armed robbery upon which appellant was convicted, the indictment included another count of armed robbery, two counts of robbery, one count of at-

tempted armed robbery, and three counts of assault with a dangerous weapon. D.C.Code 1973, §§ 22–2901, –3202; 22–2901; 22–2901, –3202, and 22–502.

supported by the record.[4]   *See* D.C.Code 1973, § 17-305(a).

■ While appellant correctly observes that the poisonous tree doctrine is not confined to the direct "fruits" of police misconduct (*e. g.*, tangible items improperly seized, or a confession obtained during an illegal detention), it does not follow that, simply because his arrest ultimately was followed by his in-court identification by the three women, there was a sufficient relationship between the two events to warrant application of the exclusionary rule. The *Wong Sun* Court expressly declined to adopt a "but for" test as the appropriate analytical mode (371 U.S. at 487–88, 83 S.Ct. 407), and subsequent case law uniformly has demanded more than a superficial demonstration of a causal chain between the improper act and the disputed evidence. *See, e. g., State v. Miranda,* 104 Ariz. 174, 450 P.2d 364 (1969) (en banc); *People v. McInnis,* 6 Cal.3d 821, 100 Cal. Rptr. 618, 494 P.2d 690 (en banc), *cert.*

*denied,* 409 U.S. 1061, 93 S.Ct. 562, 34 L. Ed.2d 513 (1972); *People v. Pettis,* 12 Ill. App.3d 123, 298 N.E.2d 372, 375 (1973). It is true, however, that a sufficient connection may be found where the breach of the accused's constitutional rights provided the government with what might be called the "opportunity for incrimination" by revealing the identity of a crucial witness [*see, e. g., Smith v. United States,* 120 U. S.App.D.C. 160, 344 F.2d 545 (1965); *Abbott v. United States,* D.C.Mun.App., 138 A.2d 485 (1958)], or, in some cases, by revealing the fact of the offense itself. *See, e. g., United States v. Schipani,* 289 F. Supp. 43, 61–63 (E.D.N.Y.1968), *aff'd,* 414 F.2d 1262 (2d Cir. 1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970). Appellant apparently seeks an expansion of the *Wong Sun* doctrine in this direction. He posits that absent his arrest and detention, his identity would have remained unknown and there would have been no opportunity for the in-court identifications.[5]   Essentially, he argues

---

4. Appellant contends that the trial court erred "as a matter of law" in applying an "independent basis" test to the proffered testimony. We disagree. As the Seventh Circuit recognized in *United States ex rel. Owens v. Twomey,* 508 F.2d 858, 865 (7th Cir. 1974), whether the disputed evidence falls within the principle of *Wong Sun* may be answered by any one of three general tests: "independent source", "attenuated basis", or "inevitable discovery". While it is true that the concern underlying these exceptions to the *Wong Sun* doctrine [*i. e.*, the need for and possibility of deterring improper government activity, see *Brown v. Illinois,* 422 U.S. 590, 608–12, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)] differs from that at the bottom of the "independent basis" test embraced in *United States v. Wade, supra* (*i. e.*, the impact of such misconduct on the reliability of the evidence), the doctrines share a common analytical approach. See *United States v. Wade, supra,* 388 U.S. at 241, 87 S.Ct. 1926. Whether the question is that of reliability or deterrent potential, the pertinent inquiry is the relationship or proximity of the challenged government activity to the proffered evidence. The greater the "independence" of the evidence from such activity, the less likely it is that its reliability has been impaired thereby, and

the less likely that suppression under *Wong Sun* will yield the desired deterrence. *See Brown v. Illinois, supra,* 422 U.S. at 608–12, 95 S.Ct. 2254 (Powell, J., concurring in part); *see also Clemons v. United States,* 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968) (en banc), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); *United States ex rel. Pella v. Reid,* 527 F.2d 380, 382–83 (2d Cir. 1975).

5. Even under the less rigorous causal analysis of the "but for" test, appellant's argument is implausible, for it requires the assumption that absent the improper detention the police never would have been able to ascertain the identity of the robber. The record reveals that before the disputed arrest the officers' attention already had focused on appellant, and that they had learned his identity at the time of the first stop, the validity of which has not been challenged. We are unwilling to suppose that had there been no second stop the police would have failed to pursue such positive leads to their ultimate conclusion. *Cf. Gissendanner v. Wainwright,* 482 F.2d 1293, 1297 (5th Cir. 1973). We agree with the views of the Pennsylvania Supreme Court expressed in *Commonwealth v. Garvin,* 448 Pa. 258, 264, 293 A.2d 33, 37 (1972):

Although we agree with appellant as to the illegality of the arrest we must disagree

that he was the "fruit" of the police mis-. conduct. We find this theory unacceptable.

We rejected a similar argument in *Bond v. United States, supra,* where it was asserted that the police had focused their investigation of a confidence game on the defendant as a result of a photograph obtained during what was alleged to have been a pretextual arrest for a traffic violation. While we concluded that the traffic arrest had resulted in no such focus, and hence there had been no "exploitation" of the alleged misconduct, we expressed doubt that the *Wong Sun* doctrine reached the essentially nonevidentiary circumstance of the accused's later presence in the courtroom (310 A.2d at 224–25):

> Even assuming the illegality of the prior arrest, we regard [appellant's] position as untenable. In the first place, he points to no particular "fruit" of this alleged "poisonous tree" which was introduced into evidence against him. This doctrine does not operate so broadly as to bar all subsequent prosecutions. Rather it operates on particular evidence, either tangible or testimonial, and, if properly invoked, causes the exclusion only of such evidence. *See Wong Sun v. United States,* [*supra*]. Here, it would seem that appellant would have us hold that he himself is the "fruit" and accordingly he should have been excluded but "[w]e have ruled on more than one occasion that a court will not inquire into the manner in which an accused is brought before it, and that the legality or illegality of an arrest is material only on the question of suppressing evidence obtained by the arrest." [Quoting *District of Columbia v. Jordan,* D.C.App., 232 A. 2d 298, 299 (1967).]

*See District of Columbia v. Perry,* D.C. App., 215 A.2d 845, 847 (1966); *Boucher v. Warden,* 5 Md.App. 51, 245 A.2d 420, 423–24 (1968). *Cf. M. A. P. v. Ryan,* D. C.App., 285 A.2d 310, 315 (1971). Our conclusion rested upon the well-established principle that, given a fair trial, the fact of an illegal arrest will not vitiate a conviction. *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). While it is true, as appellant notes, that the *Ker-Frisbie* doctrine has been the subject of some criticism [*see, e. g., United States v. Toscanino,* 500 F.2d 267, *rehearing en banc denied,* 504 F.2d 1380 (2d Cir. 1974); *United States v. Edmons,* 432 F.2d 577, 583 (2d Cir. 1970)], we have no doubt as to its continued validity. *See Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 3047, 49 L.Ed.2d 1067 (1976); *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Stevenson v. Mathews,* 529 F.2d 61, 63 (7th Cir.), *cert. denied,* 426 U.S. 954, 96 S.Ct. 3181, 49 L.Ed.2d 1193 (1976).

■ In *Payne v. United States,* 111 U. S.App.D.C. 94, 294 F.2d 723, *cert. denied,* 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961), the United States Court of Appeals sustained, by analogy to *Frisbie,* the admission of eyewitness testimony given pursuant to a confrontation which occurred during an unlawful detention. It approved, however, the exclusion of the defendant's statement which had been made during the period of illegal custody. To support its rulings, the court relied in part upon the two *Bynum v. United States* decisions, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958), *appeal after retrial,* 107 U.S.App.D.C. 109, 274 F.2d 767 (1960). In *Bynum I,* the court ordered the suppression of finger-

---

with his contention that the identifications must be suppressed. No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never [be] required to face his accusors. Thus,

we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome.

prints obtained following an illegal arrest. *Accord, Mills v. Wainwright,* 415 F.2d 787 (5th Cir. 1969); *see Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). At Bynum's second trial, the government introduced in evidence an older set of fingerprints unrelated to the unlawful arrest, and the second conviction was affirmed. We also note that the Supreme Court in *United States v. Wade, supra,* cited *Wong Sun*'s attenuation-of-taint analysis as support for its independent source rule. 388 U.S. at 241, 87 S.Ct. 1926, citing 371 U.S. at 488, 83 S.Ct. 407. We conclude that the poisonous fruit doctrine does not reach so far as to exclude identification testimony connected with an illegal arrest if, as here, there is an adequate independent source for the evidence. *See Johnson v. Louisiana,* 406 U.S. 356, 365, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); *Stevenson v. Mathews, supra; State v. Miranda, supra,* 450 P.2d at 371–72.

## III

■ Even if we were to agree with appellant that his in-court identification by the three women was causally related to his unlawful arrest in the sense

contemplated by the *Wong Sun* doctrine, our conclusion as to the admissibility of such evidence would be unchanged. The Supreme Court has emphasized that the judicially-created exclusionary rule is not aimed at redressing the harm to an individual whose constitutional rights have been invaded, but rather seeks by its deterrent effect to preserve to the whole of society the interests secured by the Fourth Amendment.[6] *See Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). As an adjunct of the exclusionary principles embraced in *Mapp v. Ohio, supra,* the fruit of the poisonous tree doctrine does not mandate the automatic exclusion of all evidence which may be linked (however tenuously) to police misconduct. *See Stone v. Powell, supra,* 465 U.S. at 487, 96 S.Ct. at 3048. Rather, the appropriate inquiry involves an examination of the circumstances of the particular case to determine both the need for and the likelihood of deterrence of the misconduct in question should the penalty of exclusion be imposed.[7] As expressed by the Fifth Circuit:

**6.** In addition to citing the objective of deterrence, the Court in *Mapp v. Ohio, supra,* also recognized the need to preserve what later was described as the "imperative of judicial integrity." *See United States v. Peltier,* 422 U.S. 531, 536–39, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). However, recent decisions have focused primarily on the question of deterrence. In *Stone v. Powell,* 428 U.S. 465, 485, 96 S.Ct. 3037, 3047, 49 L.Ed.2d 1067 (1976), the Court observed:

While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence. [Footnote omitted.]

*See Michigan v. Tucker,* 417 U.S. 433, 446–47, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *United States v. Peltier, supra.*

On the facts before us there is no question of the probative value of the disputed identification testimony. Moreover, to deny the victim of a crime the opportunity to place his or her accusation against the wrongdoer before a court of law, simply because it is determined retrospectively that the defendant

was arrested illegally, strikes us as an unacceptable perversion of the notion of judicial integrity.

**7.** The exclusionary rule has come under increasingly sharp criticism, both for its social costs and for its limited efficacy in achieving the avowed purpose of deterrence. *See Brown v. Illinois, supra* note 4, 422 U.S. at 600 n. 5, 95 S.Ct. 2254. In *Stone v. Powell, supra,* the Court observed, 428 U.S. at 490, 96 S.Ct. at 3050:

Application of the rule . . . deflects the truth finding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice. [Footnotes omitted.]

Evidence should be excluded only where the benefit accruing to society from the additional deterrent against unlawful police practices equals or exceeds the detriment to society caused by the release of criminals. [*United States v. Houltin,* 525 F.2d 943, 947 (5th Cir. 1976). *See Stone v. Powell, supra,* 428 U.S. at 484–489, 96 S.Ct. at 3047–49; *United States v. Calandra, supra,* 414 U.S. at 348, 94 S.Ct. 613; *see also Brown v. Illinois,* 422 U.S. 590, 608–12, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)].

■ In the case before us, the police misconduct consisted of arresting and detaining appellant for approximately one hour on the basis of information which fell short of constituting probable cause with respect to the robberies. We do not suggest that the episode amounted to an insignificant invasion of appellant's constitutionally protected interests. However, it is well settled that while a subsequent determination that the original arrest was made without probable cause may give rise to the exclusion of incriminating evidence resulting from the arrest, it does not provide the arrested individual with immunity from prosecution for the transaction in question. *See, e. g., Bond v. United States, supra,* at 224–25; *Gissendanner v. Wainwright,* 482 F.2d 1293 (5th Cir. 1973); *United States v. Friedland,* 441 F.2d 855, 861 (2d Cir.), *cert. denied,* 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1971). While the trial court concluded that the officers did not have

probable cause to detain appellant, their suspicions as to his involvement in the robberies and his possible truancy were soundly based [*cf. Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Johnson v. United States,* D.C.App., 349 A.2d 458 (1975); *Stephenson v. United States,* D.C.App., 296 A.2d 606 (1972), *cert. denied,* 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973)], and he was released soon after he had been photographed and it was determined that he was not a truant.[8] *Cf. Gatlin v. United States,* 117 U.S.App.D.C. 123, 128, 326 F.2d 666, 670–71 (1963); *Wise v. Murphy,* D.C.App., 275 A.2d 205 (1971) (en banc). Without more, the incident reflects good faith misjudgment on the part of the officers, scarcely warranting the severe result urged by appellant.[9] *See United States ex rel. Pella v. Reid,* 527 F.2d 380 (2d Cir. 1975).

■ Appellant's principal thrust, however, is that the gravity of the error committed by the police officers was compounded by the fact that while he was detained ostensibly for truancy, the true purpose of his detention was to gain information for the robbery investigation. At the suppression hearing, Officer Ray and Detective Ore testified that they had followed the routine procedure for truancy cases, but they acknowledged that their principal interest was in the more serious charges. We recognize that where the arrest is no more than a sham to circumvent the safeguards of the Fourth Amendment, some courts have sought to deter such miscon-

---

See also *Stone v. Powell, supra,* at 496, 96 S.Ct. at 3052–55 (Burger C. J., concurring).

8. In *Davis v. Mississippi, supra,* the Supreme Court barred the use of fingerprints obtained during an illegal detention (as part of a general dragnet operation). The Court was careful to point out: "We have no occasion in this case, however, to determine whether the requirements of the Fourth Amendment would be met by narrowly circumscribed procedures for obtaining, during the course of a criminal investigation, the fingerprints of individuals for whom there is no probable cause to arrest." 394 U.S. at 728, 89 S.Ct. at 1398.

9. As the Supreme Court noted in *Michigan v. Tucker, supra* note 6, 417 U.S. at 446, 94 S.Ct. at 2365: "Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic. Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose."

duct by barring in-court identification testimony as well as the more direct fruits of the constitutional violation. *Cf. United States v. Edmons, supra; United States ex rel. Pella v. Reid, supra.*[10] *See also Taglavore v. United States*, 291 F.2d 262 (9th Cir. 1961); *Blazak v. Eyman*, 339 F.Supp. 40 (D.Ariz.1971); *cf. People v. Dibble*, 46 App.Div.2d 829, 361 N.Y.S.2d 77, 80 (1974). However, the mere fact that by arresting an individual on one charge the officers gain an opportunity to advance their investigation of another offense does not mandate the imposition of evidentiary sanctions. In a case in which the police suspect that an individual has violated two laws, one for which they have probable cause to arrest and one for which they do not, it would be absurd to suggest that they must forego enforcement of the former simply because their primary interest is in the latter.

Appellant's reliance on *United States v. Edmons, supra*, is misplaced. There, more than 50 FBI agents swept a neighborhood in an effort to locate individuals who had assaulted and interfered with other agents who had been attempting to execute an arrest warrant. The officers knew only that the suspects were "young and black", and were instructed to round up such persons on the charge of failure to have their selective service cards in their possession, in the hope that the victims of the assault would be able to pick out their assailants. *Id.* at 580–81. *Cf. Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 59–60, 478 F.2d 938, 969–70, *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973). Five men were arrested on the pretext,[11] and four were identified and subsequently convicted. The trial court found their arrests to have been illegal, but concluded that the in-court identification testimony rested upon the independent bases of the agents' observations at the time of the assaults. The Second Circuit did not disturb this conclusion (*see* 432 F.2d at 582–83), but, concerned with the gravity of the agents' misconduct, reasoned that the illegal arrests had been the "necessary cause" of such testimony and concluded that the deterrent principles of *Wong Sun* required that the indictments be dismissed.[12]

The case before us is readily distinguishable. Here there is no dragnet. Appellant's arrest was not the result of a random or indiscriminate roundup of possible suspects. *See Ellis v. United States*, 105 U.S.App.D.C. 86, 264 F.2d 372, *cert. denied*, 359 U.S. 998, 79 S.Ct. 1129, 3 L.Ed.2d 986 (1959); *People v. Lee*, 84 Misc.2d 192, 375 N.Y.S.2d 812, 816 (Sup.Ct.1975). *Cf. Davis v. Mississippi, supra.* Although the trial court concluded that the circumstances did not provide the officers with probable cause, the record reveals that their focus on appellant was supported by the facts that (1) he was found near the scene of the recent robberies, (2) he matched the general description provided by the three victims, and (3) he was tenta-

---

10. In *Pella* the Second Circuit rejected an argument that its earlier decision in *Edmons* required the exclusion of the in-court identification of an individual who had been arrested without probable cause. It reasoned that the testimony rested on the independent basis of the witness' first-hand observations of the crime, and distinguished *Edmons* on the basis that Pella had not been arrested as part of a dragnet or upon a deliberately false pretense. 527 F.2d at 382–83.

11. The circuit court observed that the government could point to no case in which the inadvertent failure to carry the required identification actually had been prosecuted. 432 F.2d at 582.

12. The *Edmons* court was careful to limit its conclusion to the extreme factual pattern before it (432 F.2d at 584): "We are not obliged here to hold that when an arrest made in good faith turns out to have been illegal because of lack of probable cause an identification resulting from the consequent custody must inevitably be excluded. But in a case like this, where flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring any use of them can adequately serve the deterrent purpose of the exclusionary rule." [Footnote omitted.] *See United States ex rel. Pella v. Reid, supra*, at 382–83.

tively identified by the witness Dickens. *Cf. Johnson v. United States, supra; United States v. Hall,* 174 U.S.App.D.C. 13, 15–16, 525 F.2d 857, 859–60 (1975).

▬ Nor was the alleged pretext upon which appellant was detained the violation of a rarely enforced statute, the investigation of which was abandoned as soon as the apprehension was effected.[13] While we express no approval of the officers' investigatory tactics, we do not view the facts as presenting the sort of egregious misconduct the deterrence of which would warrant the extreme sanction of barring the in-court identification testimony of the victims. *Cf. United States ex rel. Pella v. Reid, supra,* at 382–83; *Paulson v. State,* 257 So.2d 303, 305 (Fla.App.1972), *federal habeas corpus denied sub nom. Paulson v. Florida,* 360 F.Supp. 156 (S.D.Fla.1973); *see also Lockridge v. Superior Court,* 3 Cal.3d 166, 89 Cal.Rptr. 731, 734, 474 P.2d 683, 686 (1970) (en banc), *cert. denied,* 402 U.S. 910, 91 S.Ct. 1387, 28 L.Ed.2d 652 (1971).

▬ The Supreme Court recently declared that "the policies behind the exclusionary rule are not absolute" and "must be evaluated in light of competing policies." *Stone v. Powell, supra,* 428 U.S. at 488, 96 S.Ct. at 3049. Against whatever incremental deterrence arguably might be provided by barring the victims' in-court testimony, in addition to the photographic and lineup identification which were excluded by the trial court, must be weighed the costs of such a penalty.[14] *See Brown v. Illinois, supra,* 422 U.S. at 608–12, 95 S. Ct. 2254 (Powell, J., concurring in part).

Appellant does not seriously contend that the women's recollections of the robberies became tainted by the fact of the illegal arrest. He does not deny that the police were aware of both the fact of the assaults and the identities of the complaining witnesses prior to the disputed detention. Rather, he argues that but for the detention the officers would not have learned his identity, and consequently there would have been no prosecution and no opportunity for the chain of separate circumstances to coalesce into the incriminating identification testimony.[15] In the final analysis, what appellant seeks is no less than an immunity from any prosecution. On the facts of this case, such a price

13. While the officers did not deny that they were interested primarily in the robberies, the record reveals that they dutifully pursued the truancy matter after appellant had been taken into custody, and released him soon after his nontruancy had been established. Unlike the enforcement of dormant statutes such as those requiring the possession of selective service identification, the mandate that all children between the ages of seven and 16 attend school is regularly enforced, and, as in the case before us, the possibility of its breach may come to the officer's attention before the intrusion of stopping the individual.

14. *See Michigan v. Tucker, supra* note 9, 417 U.S. at 450, 94 S.Ct. at 2367: "[W]hen balancing the interests involved, we must weigh the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce."

15. Appellant's argument goes too far, for if the offending link in the chain is the knowledge of the identity of the particular individual to whom the untainted recollections and other evidence pertain, the appropriate remedial response would be to require the police to disgorge such knowledge. However, unlike other forms of evidence which can be forever excluded from any use by the government in a prosecution of the individual, improperly gained knowledge of a felon's identity cannot be so easily erased. *Cf. Etheridge v. United States,* 380 F.2d 804, 808 (5th Cir. 1967) ("the facts obtained through the unlawful conduct do not become 'sacred and inaccessible'"). It would be a ridiculous charade to require that appellant's conviction be set aside so that the police could attempt a new investigation of the robberies by officers unaware of the tainted information. *See Gissendanner v. Wainwright, supra,* at 1296. *Cf. Stevenson v. Mathews, supra,* at 63.

would be too high.[16]  *See Gissendanner v. Wainwright, supra; People v. Lee, supra.* As the circuit court observed in a similar case, *Payne v. United States, supra,* at 98, 294 F.2d at 727:

> The suppression of the testimony of the complaining witness is not the right way to control the conduct of the police, or to advance the administration of justice. The rights of the accused in a case like the present are adequately protected when the complaining witness takes the stand in open court, for examination and cross-examination.

We conclude that the trial court did not err in denying appellant's motion to exclude the in-court identification testimony of the robbery victims.

*Affirmed.*

FICKLING, Associate Judge, dissenting:

The issue presented by this case is whether the in-court identification was the direct "fruit" of an illegal, sham arrest of appellant and, as such, should have been suppressed.  The majority is of the opinion that the arrest here was not a sham and therefore affirms the ruling below.  I disagree.

The trial court found, and the government conceded during the suppression

hearing, that appellant was under arrest when he was transported to Park Police Headquarters for the picture-taking procedure.  As this court noted in *District of Columbia v. Perry,* D.C.App., 215 A.2d 845, 847 (1966), quoting *Price v. United States,* D.C.Mun.App., 119 A.2d 718, 719 (1956), "the essence of an arrest 'is a restriction of the right of locomotion or a restraint of the person.'"

The arrest of appellant as a suspected truant was a patent sham, designed solely to obtain identification evidence of his possible involvement in unrelated crimes, for which there existed no probable cause.[1] Such sham or pretextual arrests consistently have been condemned.  *See, e. g., Hill v. United States,* 135 U.S.App.D.C. 233, 418 F.2d 449 (1968); *Amador-Gonzalez v. United States,* 391 F.2d 308 (5th Cir. 1968); *United States v. Harris,* 321 F.2d 739 (6th Cir. 1963); *Taglavore v. United States,* 291 F.2d 262 (9th Cir. 1961); *Charles v. United States* 278 F.2d 386 (9th Cir. 1960) *McKnight v. United States,* 87 U.S.App.D.C. 151, 183 F.2d 977 (1950).  A court should not indulge in "ex post facto extrapolations of all crimes that might have been charged on a given set of facts at the moment of arrest . . . [for] such an exercise might permit an arrest that was a sham or fraud at the outset, really unrelated to the crime for which

16. In *Gissendanner v. Wainwright, supra,* the Fifth Circuit reached a similar conclusion. In rejecting what would in effect be a grant of immunity, it reasoned (482 F.2d at 1297):

> Certainly, before any consequences so destructive of society's right to be protected from violent crimes is to be set in motion, there would have to be a respectable showing that (i) it was *solely* through such invalid source that identity was ascertained, and (ii) there was no likelihood that it would have subsequently been discovered through other police efforts.

Similarly, in *United States v. Friedland, supra,* at 861, the Second Circuit declared:

> Courts must neither so narrow the [exclusionary] rule as to impair its presumed deterrent effect nor expand it in such a way that, in order to achieve a marginal increment of deterrence, society will pay too

high a price. * * * We are confident [that the Supreme Court] would . . . hold that to grant life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law-abiding citizen he purported to be would stretch the exclusionary rule beyond tolerable bounds.

1. The trial court properly found that there was no probable cause to arrest appellant for robbery where there was a police lookout for a Negro male, age 15–18, with a slender build and light complexion, and appellant, a Negro male, age 16, was seen 3 days after the last reported incident standing in a public place at midday in a nonconspicuous manner. *See Gatlin v. United States,* 117 U.S.App.D.C. 123, 326 F.2d 666 (1963).

probable cause to arrest was actually present to be retroactively validated." *United States v. Martinez,* 465 F.2d 79, 81–82 (2d Cir. 1972), quoting *United States v. Atkinson,* 450 F.2d 835, 838 (5th Cir. 1971). Nor will such an arrest be valid when it was merely a ploy or pretext used to afford police the time and opportunity to investigate and amass facts sufficient to constitute probable cause. *Martinez, supra; Atkinson, supra; Mills v. Wainwright,* 415 F.2d 787 (5th Cir. 1969); *Staples v. United States,* 320 F.2d 817 (5th Cir. 1963).

The majority relies on *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). For years, these two cases have been the crux of a doctrine to the effect that the government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires control over him. Due process was satisfied so long as the defendant had "a fair trial in accordance with constitutional procedural safeguards." *Frisbie, supra* at 522, 72 S.Ct. at 512; *see Ker, supra,* 119 U.S. at 440, 7 S.Ct. 225. However, since *Frisbie,* the Court has made an effort to deter police misconduct. Due process has been extended to exclude the fruits of the government's own deliberate and unnecessary lawlessness in bringing an accused to trial. *See United States v. Russell,* 411 U.S. 423, 430–31, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L. Ed.2d 1081 (1961); *Silverman v. United States,* 365 U.S. 505, 81 S.Ct. 679, 5 L. Ed.2d 734 (1961). Moreover, in recent years the *Ker-Frisbie* rule has been strongly criticized. *See United States v. Toscanino,* 500 F.2d 267, 272 (2d Cir. 1974); *United States v. Edmons,* 432 F.2d 577, 583 (2d Cir. 1970); *Government of Virgin Is-*

*lands v. Ortiz,* 427 F.2d 1043, 1045 n. 2 (3d Cir. 1970).

I find I cannot agree with the position taken by the majority that the admissibility of the in-court identification was controlled by the "independent basis" test. The Supreme Court's stated concern in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), was the reliability of in-court identifications which are based upon suggestive out-of-court identifications. This differs greatly from the gravamen of the Court's decision in *Wong Sun v. United States, supra* which was the deterrence of improper government activity by the exclusion of otherwise reliable evidence. The question before us here is not whether the in-court identification was reliable, but whether it was the fruit of the illegal, sham arrest and, as such, should have been excluded notwithstanding reliability.

The instant case differs greatly from most that have dealt with the use of the "fruits" of illegal arrests. The arrest here violated the Fourth Amendment not so much because the police officer lacked probable cause, but because he deliberately seized appellant on a mere pretext for the purpose of obtaining his photograph and displaying it to the victims of the robberies. *See United States v. Edmons, supra.* Hence, in my view the majority's reliance on *Bond v. United States,* D.C.App., 310 A.2d 221 (1973), and *Payne v. United States,* 111 U.S.App.D.C. 94, 294 F.2d 723, *cert. denied,* 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961), is misplaced since neither of those cases involved a sham or pretextual arrest.

The Supreme Court has prescribed that our inquiry in cases where a primary illegality has been demonstrated must be

whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguisha-

1075

ble to be purged of the primary taint. [*Wong Sun v. United States, supra,* 371 U.S. at 488, 83 S.Ct. at 417 quoting Maguire, Evidence of Guilt, 221 (1959).]

Here, the illegal arrest of appellant for the sole purpose of obtaining and exhibiting his photograph to the robbery victims, with a view toward having any resulting identification duplicated at trial, is clearly an exploitation of the "primary illegality." *United States v. Edmons, supra. See also Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Bynum v. United States,* 107 U.S.App.D.C. 109, 274 F.2d 767 (1960). Such an illegal arrest made for the precise purpose of securing identifications that otherwise would not have been obtained epitomizes, in my view, the evils sought to be prevented by the exclusionary rule.

Generally, the exclusionary rule has been applied in cases where the primary illegality is somehow connected with the evidence-gathering or investigative process. *See, e. g., United States v. Wade, supra; Wong Sun v. United States, supra; Nardone v. United States,* 308 U.S. 338, 60 S. Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). It is within this context that the Second Circuit Court of Appeals explained in *United States v. Edmons, supra* at 584, that the government "exploits" an illegal arrest when it obtains a conviction based on evidence gathered pursuant to its unconstitutional act.

The majority's attempt to distinguish *Edmons* from the instant case is tenuous at best. The fact that 50 law enforcement officers were involved in *Edmons,* as opposed to 2 officers here, is of no moment. As in *Edmons,* the officers here knew only that the suspect was "young and black." Moreover, the arrests in both cases were mere pretexts made in bad faith, without probable cause, and ostensibly for truancy here and Selective Service Act violations [2] in *Edmons,* but in reality for the purpose of obtaining identification evidence in unrelated crimes.[3]

As the Supreme Court has instructed, the exclusionary rule is calculated to deter. Its function is "to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). There is also a second function of the rule, and that is the "imperative of judicial integrity." *Elkins, supra* at 222, 80 S.Ct. 1437. *See also United States v. Peltier,* 422 U.S. 531, 536, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). The mainstay of the judicial integrity theory is that courts should not act as "accomplices in the willful disobedience of [the] Constitution." *Elkins, supra,* 364 U. S. at 223, 80 S.Ct. at 1447. In other words, by suppressing evidence which has been illegally seized a court's integrity remains intact by its refusal to perpetuate a violation of the constitutional rights of an accused.

Accordingly for the above reasons, I dissent.

2. Defendants were charged with failure to have their Selective Service cards in their possession in violation of 18 U.S.C.A. § 111; Military Selective Service Act, § 12(b)(6), 50 U.S.C.A.App. § 462(b)(6).

3. During a pretrial suppression hearing in this case, the arresting police officer acknowledged that he considered appellant a potential suspect in the robbery cases from the moment he first saw him. He tried to explain that photographing was "customary procedure" in truancy cases. However, that testimony was flatly contradicted by the robbery squad detective who took the photographs and acknowledged that his real purpose was to obtain pictures to show to complaining witnesses in the robbery cases.